# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### AIKEN DIVISION

| | |
|---|---|
| SHAWN WILLIAMS, DAVID GREEN, JAMIE COOMES, MALCUM KENNER, AND ANDREW BARRETT, individually and as representatives of a class of participants and beneficiaries on behalf of the Centerra Group, LLC 401(k) Plan (nka the Constellis 401(k) Plan), | Civil Action No. _1:20-cv-04220_-MGL |
| *Plaintiffs*, | COMPLAINT—CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| CENTERRA GROUP, LLC, THE BENEFIT PLAN COMMITTEE OF THE CENTERRA GROUP, LLC, THE INVESTMENT COMMITTEE OF THE CENTERRA GROUP, LLC, AON HEWITT INVESTMENT CONSULTING, INC. (NKA AON INVESTMENTS USA, INC.), PAUL P. DONAHUE, DEBORAH F. RICCI, MARCIA ALDRICH, AND JOHN DOES 1–10, | |
| *Defendants*. | |

## COMPLAINT

1.     Plaintiffs Shawn Williams, David Green, Jamie Coomes, Malcum Kenner, and Andrew Barrett, individually and as representatives of a class of participants and beneficiaries of the Centerra Group, LLC 401(k) Plan, bring this action under 29 U.S.C. §1132(a)(2) and (a)(3) on behalf of the Plan against Defendants Centerra Group, LLC, the Benefit Plan Committee of the Centerra Group, LLC, the Investment Committee of the Centerra Group, LLC, Aon Hewitt Investment Consulting, Inc. (nka Aon Investments USA, Inc.), Paul P. Donahue, Deborah F. Ricci, Marcia Aldrich, and John Does 1–10, for breach of fiduciary duties and prohibited

transactions under ERISA.[1]

2.      The marketplace for retirement plan services is established and competitive. Large defined contribution plans, like the Centerra Group, LLC 401(k) Plan (the Plan or the Centerra Plan),[2] have tremendous bargaining power to obtain high quality, low-cost Plan services. As Plan fiduciaries, Defendants were obligated to act for the exclusive benefit of Plan participants and beneficiaries and to ensure that Plan expenses are reasonable and Plan investments are prudent. These duties are the "highest known to the law", and must be discharged with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Instead of acting in the exclusive best interest of participants, Aon Hewitt acted in its own interest by causing the Plan to invest in Aon Hewitt's proprietary collective investment trusts, which benefitted Aon Hewitt at the expense of Plan participants' retirement savings. The Centerra Defendants also failed to use the Plan's bargaining power to negotiate reasonable recordkeeping fees, which caused unreasonable recordkeeping expenses to be charged to Plan participants.

3.      To remedy these breaches of duty, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (a)(3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek equitable or remedial relief for the Plan as the Court may deem appropriate.

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.
[2] All references to the "Plan" or the "Centerra Plan" are intended to include the successor Constellis 401(k) Plan to the extent necessary to obtain complete relief.

## JURISDICTION AND VENUE

4.    **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

5.    **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where the Plan (now the Constellis 401(k) Plan) is or was administered, where at least one of the alleged breaches took place, or where at least one defendant resides or may be found.

6.    **Standing.** An action under §1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to bring a civil action to seek relief on behalf of a plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury, each Plaintiff has suffered such an injury, in at least the following ways:

        a.    The Named Plaintiffs suffered harm to their individual accounts as a result of the Centerra Defendants and Aon Hewitt's fiduciary breaches. During the proposed class period, the Named Plaintiffs collectively invested in each of the Aon Hewitt collective investment trusts provided in the Plan. For instance, Plaintiff Williams invested in the Aon Hewitt Large Cap Equity Fund, the Aon Hewitt Small & Mid Cap Equity Fund, and the Aon Hewitt Non-U.S. Equity Fund. Plaintiff Green invested in the Aon Hewitt Core Plus Bond Fund, the Aon Hewitt Large Cap

Equity Fund, the Aon Hewitt Non-U.S. Equity Fund, and one of the Aon Hewitt Retirement Solution Funds. Plaintiff Coomes invested in one of the Aon Hewitt Retirement Solution Funds. And Plaintiff Barrett invested in the Aon Hewitt Large Cap Equity Fund, the Aon Hewitt Non-U.S. Equity Fund, and one of the Aon Hewitt Retirement Solution Funds. By providing the Aon Hewitt collective investment trusts, the Centerra Defendants and Aon Hewitt caused millions of dollars in performance losses to all participants who invested in these funds.

b.  The Named Plaintiffs and all participants in the Plan suffered financial harm as a result of the Centerra Defendants' breach in retaining Voya Institutional Plan Services, LLC (Voya) as the Plan's recordkeeper without properly monitoring and reducing the compensation paid to Voya from the Plan, which came out of each participant's account. That excessive compensation includes payments that Voya received from providing managed account services. Had Voya's compensation been reduced to reasonable levels, every participant's account would have had fewer recordkeeping fees deducted and would have been of higher value in light of those fees and the investment return on those fees.

## PARTIES

### The Centerra Group, LLC 401(k) Plan (now the Constellis 401(k) Plan)

7.      Prior to January 1, 2019, the Centerra Group, LLC 401(k) Plan was a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34) in which substantially all of the employees of the Centerra Group, LLC (Centerra) and affiliated employers may participate.

8.      As of December 31, 2013, the Plan then called G4S Government Solutions, Inc. 401(k) and Retirement Plan had $273 million in net assets and 4,161 participants with account

balances. Effective November 24, 2014, the G4S Government Solutions plan's name was changed to the Centerra Group, LLC 401(k) Plan. By December 31, 2018, the Plan had grown to $350 million in net assets and 5,036 participants with account balances. Effective January 1, 2019, the Plan's assets and participants were transferred to the Constellis 401(k) Plan (Constellis Plan), which increased that plan's size from $45 million in assets and 1,594 participants with account balances to approximately $400 million in assets and over 6,500 participants.

9.      The Constellis Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34) in which eligible employees of Constellis, LLC (Constellis) and its affiliates and subsidiaries, and employees of certain employers unrelated to Constellis may participate. At all relevant times, the Plan has been a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

10.      At all relevant times, the Plan was established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1). Under the Plan, participants are responsible for investing their individual accounts and will receive in retirement only the current value of that account, which will depend on the amount contributed to the account by the employee and employer, and the performance of investment options net of fees and expenses. Plan fiduciaries control what investment options are provided in the Plan and the Plan's fees and expenses.

**Plaintiffs**

11.      Shawn Williams is a current employee of Centerra, and works at the Centerra-Savannah River Site in Aiken, South Carolina. He resides in Aiken, South Carolina. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

12.      David Green is a current employee of Centerra, and works at the Centerra-

Savannah River Site in Aiken, South Carolina. He resides in Aiken, South Carolina. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

13.    Jamie Coomes is a current employee of Centerra, and works at the Centerra-Savannah River Site in Aiken, South Carolina. He resides in Aiken, South Carolina. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

14.    Malcum Kenner is a current employee of Centerra, and works at the Centerra-Savannah River Site in Aiken, South Carolina. He resides in Aiken, South Carolina. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

15.    Andrew Barrett is a current employee of Centerra. He resides in Martinez, Georgia. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

**Defendants**

16.    Centerra Group, LLC (Centerra) is a Delaware limited liability company that is authorized to do business in South Carolina and has offices in Aiken County, South Carolina. Centerra is a wholly owned subsidiary of Constellis, LLC and is headquartered in Herndon, Virginia.

17.    Prior to January 1, 2019, Centerra was the Plan sponsor under 29 U.S.C. §1102(a)(1) and Plan administrator under 29 U.S.C. §1002(16). Following the Plan's merger, Constellis assumed those responsibilities and is the Plan Sponsor and Plan administrator. As alleged herein, Centerra exercised discretionary authority or discretionary control respecting the management of the Plan, exercised authority or control respecting the management or disposition

of Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and was a fiduciary under 29 U.S.C. §1002(21)(A)(i) and (iii).

18.    The Benefit Plan Committee of the Centerra Group, LLC (Centerra Benefits Committee) was responsible for the administration of the Plan prior to January 1, 2019. Centerra also referred to that committee as the Benefits Committee. Rather than screening individuals for their qualification and suitability to be an ERISA fiduciary or appointing specific individuals to be members of the Centerra Benefits Committee, members were appointed based on whatever individuals occupy the following Centerra offices: President and Chief Executive Officer, Chief Financial Officer, and Senior Vice President of Human Resources. As alleged herein, the Centerra Benefits Committee and its individual members exercised discretionary authority or discretionary control respecting the management of the Plan, exercised authority or control respecting the management or disposition of Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and were fiduciaries under 29 U.S.C. §1002(21)(A)(i) and (iii).

19.    The Investment Committee of the Centerra Group, LLC (Centerra Investment Committee) was responsible for the selection of investment options in the Plan prior to January 1, 2019. As alleged herein, the Centerra Investment Committee and its individual members exercised discretionary authority or discretionary control respecting the management of the Plan, exercised authority or control respecting the management or disposition of Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and were fiduciaries under 29 U.S.C. §1002(21)(A)(i) and (iii).

20.    Paul P. Donahue was President of Centerra from 2010 through 2019, and Chief Executive Officer of Centerra from 2012 through 2019, and as such was a member of the

Centerra Benefits Committee from at least 2012 to 2019.

21.    Deborah F. Ricci was Chief Financial Officer of Centerra from 2015 through 2017, and as such was a member of the Centerra Benefits Committee during that period.

22.    Marcia Aldrich was Senior Vice President of Human Resources of Centerra from 2013 through 2019, and as such was a member of the Centerra Benefits Committee during that period.

23.    John Does 1–10 are Plan fiduciaries unknown to Plaintiffs who exercised discretionary authority or discretionary control respecting the management of the Plan, exercised authority or control respecting the management or disposition of their assets, or had discretionary authority or discretionary responsibility in the administration of the Plan and are fiduciaries under 29 U.S.C. §1002(21)(A)(i) and (iii).

24.    Because the Centerra individuals and entities described above acted as alleged herein as agents of Centerra, these defendants are collectively referred to hereafter as the "Centerra Defendants" unless otherwise indicated.

25.    Aon Hewitt Investment Consulting, Inc. (Aon Hewitt) is a registered investment adviser under the Investment Advisers Act of 1940 with its principal place of business in Chicago, Illinois. In March 2020, the firm began operating as Aon Investments USA, Inc. During 2016, the Centerra Benefits Committee appointed Aon Hewitt as the Plan's discretionary investment manager as defined by 29 U.S.C. §1002(38). Until January 1, 2019, Aon Hewitt was the Plan's investment manager and a fiduciary under 29 U.S.C. §1002(38), with the power to manage, acquire, or dispose of any asset of the Plan.

26.    On October 13, 2020, Plaintiffs requested from the Constellis Plan administrator documents related to the Centerra and Constellis Plans. On November 12, 2020, the Constellis

Plan administrator responded to that request for information but refused to provide documents related to the operation or administration of the Centerra Plan, the process the Plan fiduciaries employed in making decisions on behalf of Plan participants, and any contracts with service providers, including Aon Hewitt.

### ERISA'S FIDUCIARY STANDARDS

27.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A)    for the exclusive purpose of

(i)  providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan;

[and]

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

28.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including, but not limited to, the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, monitor the funds in the plan and remove imprudent or excessively expensive funds. Fiduciaries cannot act for the benefit of third parties, including service providers to the plan such as recordkeepers, affiliated businesses, brokerage firms, or managed account service providers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1)

(plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

29.     An ERISA "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). Prudence requires a review at "regular intervals." *Id.* When making investment decisions, an ERISA fiduciary "is duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property[.]'" *In re Unisys*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting RESTATEMENT (SECOND) OF TRUSTS §227 (1959)). "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *Id*. at 435.

30.     A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. §2550.404a-1; DOL Adv. Op. 98-04A; DOL Adv. Op. 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

31.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## BACKGROUND FACTS

32.    "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that the type of retirement plan offered by the companies has essentially flipped over the last three decades.[3] The survey found that whereas in 1985, 89 of the Fortune 100 companies offered a traditional defined benefit plan, in 2012, only eleven of the Fortune 100 companies offered defined benefit plans to newly hired employees. Defined contribution plans have become America's retirement system.

33.    A fundamental difference between traditional pension plans and defined contribution plans is that in the former, the employer's assets are at risk. Because the employer is responsible for funding the pension plan to satisfy its commitments to employees, it bears all investment risks. In a defined contribution plan, the employees and retirees bear all investment

---

[3] Towers Watson, *Retirement Plan Types of Fortune 100 Companies in 2012*, Towers Watson Research Insider, Oct. 2012.

risks.

34.     Each participant in a defined contribution plan has an individual account and directs plan contributions into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Plan expenses can "significantly reduce the value of an account in a defined-contribution plan." *Id.* The fees assessed to participants are generally attributable to two types of services: plan administration and investment management.

35.     The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring administrative service providers and negotiating and approving their compensation. The fiduciaries also have exclusive control over the menu of investment alternatives to which participants may direct the assets in their accounts. The investment alternatives each have their own fees, usually expressed as a percentage of assets under management, or "expense ratio." For example, if a fund deducts 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points ("bps"). (One basis point is equal to $1/100^{th}$ of one percent.) The fees deducted from a fund's assets reduce the value of the shares and hence reduce the returns that participants receive on their investments.

36.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in

savings at retirement.[4] Over a 40-year career, this difference in fees can reduce a participant's

retirement savings by almost $500,000, as shown in the following graph.[5]



37.    Academic and financial industry literature demonstrate that high expenses are not

correlated with superior investment management. Indeed, funds with high fees on average

perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-

Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J.

ECON. BEHAV. & ORG. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of*

*Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010) (summarizing numerous studies

showing that "the most consistent predictor of a fund's return to investors is the fund's expense

ratio").

> [T]he empirical evidence implies that superior management is not priced through
> higher expense ratios. On the contrary, it appears that the effect of expenses on
> after-expense performance (even after controlling for funds' observable
> characteristics) is more than one-to-one, which would imply that low-quality

---

[4] U.S. Dept. of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019),
https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.
[5] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020,
https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/.

funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

38.    Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for large defined contribution plans which have the bargaining power to obtain the highest level of service and the very lowest fees. The fees available to these plans are orders of magnitude lower than the much higher retail fees available to small investors.

39.    The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own funds in plans and collecting the highest amount possible for plan-related services. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers through investment returns. The level of diligence used by plan fiduciaries to control, negotiate, reduce the plan's fees, and safeguard plan assets directly affects participants' retirement security.

40.    Fiduciaries must be cognizant of service providers' self-interest in maximizing fees, and cannot simply accede to the providers' desires and recommendations to include the provider's proprietary funds and services that will maximize the provider's fees without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must conduct their own independent investigation into the merits of a particular investment or service by considering alternatives.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

I.    **The Centerra Defendants and Aon Hewitt restructured the Plan in 2016 by replacing established funds with Aon Hewitt's proprietary collective investment trusts.**

41.    Aon Hewitt's predecessors include Hewitt Associates, which historically focused its defined contribution plan business on providing consulting advice to plan sponsors on investment selection and ongoing performance monitoring. Hewitt Associates touted its advice as independent and unbiased, meaning its recommendations were not influenced by affiliations with investment managers.

42.    In 2010, Aon Corporation acquired Hewitt Associates to expand its consulting operations, as part of an overall corporate strategy "aimed at strengthening and reorganizing the company in the face of declining insurance rates and weak economic growth."[6] As part of that corporate strategy to increase revenues, the newly merged Aon Hewitt later expanded beyond consulting into investment management, creating new proprietary investment products to be marketed to defined contribution plans. As discussed further below, Aon Hewitt had no prior experience managing its own funds for defined contribution plans.

43.    During 2016, the Centerra Defendants hired Aon Hewitt as the discretionary investment manager for the Plan with discretion over the selection, retention and removal of Plan investments. The Centerra Defendants retained the fiduciary responsibility to ensure that Aon Hewitt carried out its fiduciary obligations loyally and prudently, and had the duty to prevent any fiduciary breach in the selection and removal of Plan investments.

44.    Based on contractual arrangements between Aon Hewitt and defined contribution plan fiduciaries appointing Aon Hewitt to serve as the discretionary investment manager, the

---

[6] *Aon Buys Hewitt in Move to Expand Its Consulting Arm*, N.Y. TIMES (July 12, 2010), https://www.nytimes.com/2010/07/13/business/13insure.html.

Centerra Defendants did *not* require that Aon Hewitt consider all prudent investment vehicles that were available to the Plan prior to making any investment decision. In direct violation of their fundamental fiduciary obligations, the Centerra Defendants expressly agreed to allow Aon Hewitt to select for the Plan *exclusively* from its proprietary Aon Hewitt collective investment trusts, and agreed that Aon Hewitt had no obligation to consider non-proprietary investment vehicles for the Plan. Although Aon Hewitt acted as the Plan's discretionary investment manager over the Plan's investments, the Centerra Defendants retained the authority to request that Aon Hewitt retain any Plan investment not recommended by Aon Hewitt for inclusion in the Plan.

45.     After Aon Hewitt became the Plan's discretionary investment manager, the Centerra Defendants and Aon Hewitt restructured the Plan effective June 30, 2016. The Centerra Defendants partnered with Aon Hewitt to develop a new investment lineup for Plan participants. The Centerra Defendants and Aon Hewitt removed all of the Plan's actively managed equity, fixed income and target date mutual funds (11 in total) and replaced them with five Aon Hewitt collective investment trusts: the Aon Hewitt Retirement Solution target date funds, the Aon Hewitt Large Cap Equity Fund, the Aon Hewitt Small & Mid Cap Equity Fund, the Aon Hewitt Non-U.S. Equity Fund, and the Aon Hewitt Core Plus Bond Fund. (The target date funds are counted as a single investment option.).

46.     Collective investment trusts are investment vehicles maintained by a bank that consist of pooled assets of "retirement, pension, profit sharing, stock bonus or other trusts exempt from Federal income tax". 29 C.F.R. §9.18(a)(2). A collective investment trust is similar to a mutual fund or other pooled investment vehicle because it also invests in a variety of securities to create a diversified investment portfolio.

47.     As a non-depository bank, Aon Trust Company LLC maintains the Aon Hewitt

16

collective investment trusts and is the trustee of the funds. Both Aon Trust Company and Aon Hewitt are wholly owned subsidiaries of Aon Consulting, Inc. Aon Trust Company hired Aon Hewitt—effectively hired itself—as the investment adviser to perform investment advisory and investment management services with respect to each fund.

48.    Aon Trust Company and Aon Hewitt did not offer collective investment trusts to investors until October 2013.[7] Prior to that date, Aon Hewitt had not served as an investment manager of any collective investment trust provided to defined contribution plans. Aon Hewitt therefore had a limited track record as an investment manager prior to the inclusion of the Aon Hewitt funds in the Plan.

49.    Aon Hewitt does not actually manage the assets of the Aon Hewitt collective investment trusts. Aon Hewitt hires one or more unaffiliated investment managers (or sub-advisors) to do the actual investing. Upon hiring the manager or sub-advisor, the assets of the Aon Hewitt collective investment trusts are invested in other investment vehicles, such as a mutual fund or collective investment trust, managed by the unaffiliated investment manager. For the Aon Hewitt Retirement Solution Funds, Aon Hewitt invests the majority of the assets in proprietary Aon Hewitt funds for which it serves as the investment manager. Aon Hewitt collects an investment "advisory" fee charged to fund investors for its services in hiring the manager or sub-advisor, and Aon Trust Company charges an additional trustee fee. This structure results in investors paying multiple layers of fees, including an investment "advisory" fee to Aon Hewitt even though Aon Hewitt is not doing the actual selection of securities.

50.    The Centerra Defendants and Aon Hewitt failed to conduct an independent investigation into the merits of the Aon Hewitt collective investment trusts prior to placing them

---

[7] *E.g.,* Aon Hewitt Collective Investment Trust Offering Statement, Oct. 2016, at 61–62 ("Offering Stmt."); Aon Investments USA Inc., Form ADV Part 2A, Mar. 25, 2020, at 9.

in the Plan. Besides being Aon Hewitt funds selected by Aon Hewitt, the funds had a limited

performance history of less than three years when the Centerra Defendants and Aon Hewitt

decided to include them in the Plan. Over that limited history, *all* of the Aon Hewitt collective

investment trusts underperformed the benchmarks selected by Aon Hewitt or their style-specific

benchmarks. They also underperformed comparable Plan mutual funds they replaced, which had

established investment histories. As alleged in further detail *infra*, placing these funds in the Plan

violated prudent fiduciary standards governing the selection, monitoring, and removal of Plan

investments.

51.    Because Aon Hewitt lacked meaningful experience as an investment manager,

and over its limited experience was unsuccessful managing active management strategies, it is

evident that the Centerra Defendants failed to conduct a prudent investigation of Aon Hewitt's

qualifications and determine whether Aon Hewitt was sufficiently capable of managing the

Plan's assets. The track record of Aon Hewitt's proprietary investments would have been

apparent to a prudent and loyal fiduciary that these investments were inferior to prudent

alternatives available to the Plan.

52.    As the investment adviser of these collective investment trusts, Aon Hewitt had a

direct conflict of interest between acting in the exclusive best interest of Plan participants as the

Plan's discretionary investment manager while also seeking to grow its collective investment

trust business and maximize its revenue through investment advisory fees. Plan participants were

not informed that Aon Hewitt was the entity with discretion to select these investments. Plan

participants also were not informed of the internal decision-making process that the Centerra

Defendants and Aon Hewitt employed prior to selecting the Aon Hewitt funds.

53.    Following the decision to add the proprietary Aon Hewitt funds to the Plan, Aon

Hewitt earned substantial revenue from the investment advisory fees charged on the funds. Moreover, by causing the Plan to invest over $150 million in its funds—over 50% of the Plan's assets—Aon Hewitt dramatically increased its assets under management for these funds. Aon Hewitt's collective investment trust business therefore materially benefitted from the Plan's substantial investment in Aon Hewitt's proprietary funds.

54.    Effective January 1, 2019, the Plan merged into the Constellis 401(k) Plan and all of its assets were transferred to that plan. Although the Plan's fiduciaries could have maintained the Plan separate from the Constellis Plan and retained the Aon Hewitt investments, the Plan's fiduciaries decided to liquidate the Plan's assets, thereby eliminating the Aon Hewitt funds, and map those assets to corresponding investments in the Constellis Plan. "Mapping" refers to the process where the fund assets are sold, and the proceeds are transferred to the new investment option where they are reinvested. Aon Hewitt also was terminated as the Plan's investment manager, and Constellis did not retain Aon Hewitt's services for the Constellis Plan.

## II.    A prudent and loyal fiduciary would not have invested in Aon Hewitt's proprietary funds, which had insufficient performance histories and were plainly inferior to the funds they replaced and other options in the market.

### A.    The Aon Hewitt Large Cap Equity Fund (Class I)

55.    Effective June 30, 2016, the Centerra Defendants and Aon Hewitt added the proprietary Aon Hewitt Large Cap Equity Fund (Class I) to the Plan, which replaced the Plan's actively managed large cap mutual funds, including the Fidelity Contrafund (FCNTX) and the T. Rowe Price Inst'l Large Cap Growth Fund (TRLGX).[8] The Centerra Defendants mapped over $50 million in Plan assets to the Aon Hewitt Large Cap Equity Fund.

56.    The Aon Hewitt Large Cap Equity Fund was removed as a Plan investment

---

[8] The Plan's Form 5500 refers to the T. Rowe Price fund as the "T. Rowe Price Institutional Growth Fund".

option effective January 1, 2019 in connection with the Plan's merger with the Constellis Plan.

Using an active investment management strategy, the Fund seeks to achieve long-term growth of

capital by investing in a diversified portfolio of primarily large-capitalization U.S. companies.

Morningstar, Inc. is a leading provider of investment research and investment services, and is

relied on by industry professionals. Morningstar classifies the Aon Hewitt Large Cap Equity

Fund in the large cap growth asset category and uses the Russell 1000 Growth Index as its style-

specific benchmark. The Russell 1000 Growth Index measures the performance of the large-cap

growth segment of the U.S. equity universe. Of the 1,000 largest companies based on market

cap, the index includes a subset of those companies that exhibit higher price-to-book ratios and

higher forecasted growth values.

57.     In an active investment strategy, the investment manager uses her judgment in

buying and selling individual securities (*e.g*., stocks, bonds, etc.) in an attempt to generate

investment returns that surpass a benchmark index, net of fees, which are higher in actively

managed than passively managed funds. In a passive investment strategy, the investment

manager attempts to match the performance of a given benchmark index by holding a

representative sample of securities in that index. Because no stock selection or research is

necessary for the manager to track the index and trading is limited, passively managed

investments charge significantly lower fees for investment management services.

58.     In light of the effect of fees on expected returns, fiduciaries must carefully

consider whether the added cost of actively managed funds is realistically justified by an

expectation of higher returns. RESTATEMENT (THIRD) OF TRUSTS ch. 17, intro. note; *id*. § 90 cmt.

h(2). Nobel Prize winners in economics have concluded that virtually no investment manager

consistently beats the market over time after fees are taken into account. "Properly measured, the

average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[9] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010) ("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

59.    To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

60.    If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). But the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

61.    Accordingly, investment costs are of paramount importance to prudent investment

---

[9] https://www.tandfonline.com/doi/10.2469/faj.v47.n1.7.

selection. A prudent fiduciary would not select as a plan investment option a more expensive actively managed fund without determining that the fund is reasonably expected to outperform a cheaper index fund.

62.    When the Aon Hewitt funds were added to the Plan, Aon Hewitt had only limited experience managing collective investment trusts. Aon Trust Company and Aon Hewitt did not even begin to offer collective investment trusts, and in particular the Aon Hewitt Large Cap Equity Fund, until October 2013.[10]

63.    When making investment decisions, prudent fiduciaries of defined contribution plans consider the performance history, portfolio manager experience, and manager tenure of available investment alternatives. A consistent performance history and investment strategy, among other factors, demonstrate the ability of the investment manager to generate consistently superior long-term investment results. At a minimum, prudent fiduciaries require a five-year performance history for an investment option prior to its inclusion in a 401(k) plan.

64.    The Aon Hewitt Large Cap Equity Fund did not have a sufficient performance record when it was added to the Plan. The Fund did not exist until October 1, 2013.[11] It therefore had less than three years of history when the Centerra Defendants and Aon Hewitt decided to add it to the Plan. As of June 30, 2016, the Aon Hewitt Fund underperformed the benchmark identified by Aon Hewitt (S&P 500 Index) every year of its short existence, including by 257 bps since inception.[12] In comparison to its style-specific large cap growth benchmark (Russell 1000 Growth Index), the Aon Hewitt Fund underperformed the benchmark by 100 bps in 2014, and 667 bps in 2015.

---

[10] Offering Stmt. at 62.
[11] *Id.* at 61.
[12] *Id.*

65.    Over that two-year period, the Aon Hewitt Fund underperformed the Plan's existing large cap growth options (the Fidelity Contrafund and the T. Rowe Price Inst'l Large Cap Growth Fund). For the most recent calendar year before it was included in the Plan, as measured by the difference in investment returns, the Aon Hewitt Fund dramatically underperformed these funds by 746 bps to 1,108 bps.

66.    Prior to their removal in 2016, the Fidelity Contrafund and the T. Rowe Price Inst'l Large Cap Growth Fund were Plan investment options since 2013. These funds are comparable to the Aon Hewitt Large Cap Equity Fund as shown by the Centerra Defendants' decision to map their assets to the Aon Hewitt Large Cap Equity Fund. Like the Aon Hewitt Fund, Morningstar classifies the Fidelity and T. Rowe Price funds in the large cap growth asset category. The Fidelity Contrafund is benchmarked to the S&P 500 Index, and the T. Rowe Price Inst'l Large Cap Growth Fund is benchmarked to the style-specific benchmark (the Russell 1000 Growth Index).

67.    The Fidelity and T. Rowe Price funds had a consistent history of outperforming their benchmark and peers. As of December 31, 2015, the Fidelity fund outperformed its benchmark (S&P 500 Index) over one- five-, and ten-year periods.[13] From 2011 through 2015, the Fidelity Contrafund consistently ranked above the median of its peers, ranking on average in the 39th percentile. Likewise, as of December 31, 2015, the T. Rowe Price fund outperformed its style-specific benchmark (Russell 1000 Growth Index) over one-, five-, and ten-year periods.[14] From 2011 through 2015, the T. Rowe Price fund ranked in the top decile to quartile of its peer group in three out of those five years, and had an average peer ranking in the 29th percentile.

---

[13] Fidelity Contrafund, Summary Prospectus, Feb. 29, 2016, https://www.sec.gov/Archives/edgar/data/24238/000137949116002715/filing62100515.htm.
[14] T. Rowe Price Institutional Equity Funds, Inc., Form N-1A, May 1, 2016, https://www.sec.gov/Archives/edgar/data/1012968/000101296816000020/ief485b.htm#1_3.

68.     The Aon Hewitt Large Cap Equity Fund was also inferior to other comparable funds in the market. The Vanguard Growth Index Fund (Instl) (VIGIX) is a passively managed large cap growth index fund. Like the Aon Hewitt Large Cap Equity Fund, Morningstar classifies the Vanguard index fund in the large cap growth asset category and uses the Russell 1000 Growth Index as its benchmark. The Vanguard index fund also charged substantially lower expenses. In 2016, Aon Hewitt charged 37 bps compared to 5 bps charged by Vanguard, which is 640% more.[15] For the two calendar years that the Aon Hewitt Large Cap Equity Fund had an actual performance history, the Aon Hewitt Fund substantially underperformed the Vanguard index alternative by 157 bps in 2014, and 433 bps in 2015, as measured by the difference in investment returns.

69.     The MFS Growth Fund (R6) (MFEKX) is yet another example of an investment alternative that demonstrates the inferiority of the Aon Hewitt Large Cap Equity Fund. This actively managed fund is a large cap growth option offered since 1986, and is benchmarked to the same style-specific benchmark (Russell 1000 Growth Index).[16] As of December 31, 2015, the MFS fund outperformed its benchmark over one-, three- and ten-years.[17] For the two calendar years the Aon Hewitt Large Cap Growth Fund existed, it underperformed the MFS alternative. From 2011 through 2015, the MFS ranked on average in the 33rd percentile, and in two of the last three years, in the 21st percentile or better. The MFS Growth Fund is comparable to the Aon Hewitt Fund as evidenced by the Plan's fiduciaries' decision to map the assets of the Aon Hewitt Fund into the MFS fund when the Plan was merged into the Constellis Plan. It also was offered

---

[15] Offering Stmt. at 58; Morningstar.

[16] MFS Series Trust II, Form N-CSR, Nov. 30, 2015, https://www.sec.gov/Archives/edgar/data/798250/000119312516445672/d66885dncsr.htm.

[17] MFS Growth Fund, Summary Prospectus, Mar. 29, 2016, https://www.sec.gov/Archives/edgar/data/798250/000110465916107855/a16-5658_4497k.htm; Morningstar.

in the Constellis Plan since at least 2017.

70.    Because the Aon Hewitt Large Cap Equity Fund had an insufficient performance history and Aon Hewitt was unable to successfully manage the strategy by generating investment returns that exceeded its style-specific benchmark or a passively managed equivalent, the Centerra Defendants and Aon Hewitt failed to "balance the relevant factors and make a reasoned decision" that adding the actively managed Aon Hewitt Large Cap Equity Fund to the Plan was in the best interest of Plan participants or prudent, and failed to determine whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. *See George v. Kraft Foods Global, Inc*., 641 F.3d 786, 788 (7th Cir. 2011). The decision to include the Aon Hewitt Fund in the Plan only served to benefit Aon Hewitt.

71.    During the time period that the Aon Hewitt Large Cap Equity Fund was included in the Plan, it underperformed its style-specific benchmark, comparable Plan investments, and passively managed equivalents. By including the Aon Hewitt Large Cap Equity Fund in the Plan, the Centerra Defendants and Aon Hewitt caused Plan participants to lose substantial retirement assets. A prudent alternative to the Aon Hewitt Large Cap Equity Fund was the Vanguard Growth Index Fund (VIGIX). Had the Centerra Defendants and Aon Hewitt selected the Vanguard alternative instead of the Aon Hewitt Large Cap Equity Fund, Plan participants would not have lost over $4.6 million of their retirement assets.

72.    Another prudent alternative to the Aon Hewitt Large Cap Equity Fund was the T. Rowe Price Inst'l Large Cap Growth Fund (TRLGX). Had the Centerra Defendants and Aon Hewitt retained the T. Rowe Price alternative instead of the Aon Hewitt Large Cap Equity Fund as the Plan's actively managed large cap growth option, Plan participants would not have lost in

excess of $19.7 million of their retirement savings. Plan participants also would not have lost substantial retirement assets had Defendants retained the Fidelity Contrafund (FCNTX) or used the MFS Growth Fund (MFEKX), which were suitable replacements for the Aon Hewitt Large Cap Equity Fund.[18]

### B.    The Aon Hewitt Small & Mid Cap Equity Fund (Class I)

73.    Effective June 30, 2016, the Centerra Defendants and Aon Hewitt added the proprietary Aon Hewitt Small & Mid Cap Equity Fund (Class I) to the Plan. The Aon Hewitt Fund replaced two actively managed mutual funds, including the T. Rowe Price New Horizons Fund. The Centerra Defendants mapped over $15 million invested in those funds to the Aon Hewitt Small & Mid Cap Equity Fund.

74.    The Aon Hewitt Small & Mid Cap Equity Fund was removed as a Plan investment option effective January 1, 2019 in connection with the Plan's merger with the Constellis Plan. Using an active investment management strategy, the Fund seeks to achieve long-term growth of capital by investing in a diversified portfolio of primarily small and mid-sized U.S. companies. Morningstar classifies the Fund in the mid-cap growth asset category and uses the Russell Mid Cap Growth Index as its style-specific benchmark. The Russell Mid Cap Growth Index measures the performance of the mid-cap growth segment of the U.S. equity universe. Of the approximately 800 of the smallest securities based on their market cap, the index includes a subset of those companies that exhibit higher price-to-book ratios and higher forecasted growth values.

75.    The Aon Hewitt Small & Mid Cap Equity Fund did not have a sufficient performance record when it was added to the Plan. Aon Hewitt first offered the Fund on October

---

[18] Plan losses have been brought forward through September 30, 2020 to account for lost investment opportunity.

1, 2013.[19] The Fund therefore had less than three years of history when the Centerra Defendants and Aon Hewitt decided to add it to the Plan. As of June 30, 2016, the Fund underperformed the benchmark identified by Aon Hewitt (Russell 2500 Index) over all reporting periods, including 156 bps since inception.[20] As measured by the difference in investment returns, the Fund also underperformed the style-specific mid-cap growth index (Russell Mid Cap Growth Index) by 650 bps in 2014 and 410 bps in 2015.

76.      For the two full calendar years that the Aon Hewitt Small & Mid Cap Equity Fund had an actual performance record (2014 and 2015), the Fund also underperformed the Plan's existing T. Rowe Price New Horizons Fund (PRNHX), which is a mid-cap growth fund benchmarked to the Russell 2000 Growth Index.[21] Prior to its removal in 2016, the T. Rowe Price fund was a Plan investment option since at least 2013. As of December 31, 2015, the T. Rowe Price fund outperformed its benchmark over one-, five-, and ten-year periods.[22] For the five-year period from 2011 through 2015, the fund ranked in the 22[th] percentile or better in its peer group in each year, including an average peer ranking in the 12th percentile during that period.

77.      The Aon Hewitt Small & Mid Cap Equity Fund was also inferior to other comparable funds in the market. The Vanguard Mid-Cap Growth Index Fund (Adm) (VMGMX) is a passively managed mid-cap growth index fund. Like the Aon Hewitt Fund, Morningstar classifies the Vanguard index fund in the mid-cap growth asset category and uses the Russell Mid Cap Growth Index as its benchmark. The Vanguard index fund also charged substantially

---

[19] Offering Stmt. at 61.

[20] *Id.*

[21] From 2010 through 2017, the T. Rowe Price New Horizons Fund was classified as a small cap growth fund.

[22] T. Rowe Price New Horizons Fund, Summary Prospectus, May 1, 2016, https://www.sec.gov/Archives/edgar/data/80248/000008024816000030/nhfpta-may35.htm.

lower expenses. In 2016, Aon Hewitt charged 70 bps compared to 8 bps charged by Vanguard, which is 775% more.[23] For the two full calendar years that the Aon Hewitt Small & Mid Cap Equity Fund had an actual performance history, as measured by the difference in investment returns, the Aon Hewitt Fund substantially underperformed the Vanguard index alternative by 808 bps in 2014 and 332 bps in 2015.

78.    The Hartford MidCap HLS Fund (IA) (HIMCX) is yet another example of an investment alternative that demonstrates the inferiority of the Aon Hewitt Small & Mid Cap Equity Fund. This actively managed fund is a mid-cap growth option offered since 1997, and is benchmarked to a mid-cap index (S&P MidCap 400 Index).[24] As of December 31, 2015, the Hartford fund outperformed its benchmark over one-, five- and ten-year periods.[25] For the two calendar years the Aon Hewitt Small & Mid Cap Equity Fund existed, it dramatically underperformed the Hartford alternative by 597 bps in 2014 and 590 bps in 2015, as measured by the difference in investment returns. From 2011 through 2015, the Hartford ranked on average in the 28th percentile, and better than the 15th percentile in three of those five years. Hartford charged fees equivalent to those charged by Aon Hewitt. The Hartford fund is comparable to the Aon Hewitt Fund as evidenced by the Plan's fiduciaries' decision to map the assets of the Aon Hewitt Fund into the Hartford fund when the Plan was merged into the Constellis Plan. It also was offered in the Constellis Plan since at least 2017.

79.    Because the Aon Hewitt Small & Mid Cap Equity Fund had an insufficient performance history and Aon Hewitt was unable to successfully manage the strategy by

---

[23] Offering Stmt. at 58; Morningstar.

[24] Hartford Series Fund, Inc., Form N-CSR, Dec. 31, 2015, https://www.sec.gov/Archives/edgar/data/1053425/000119312516485685/d100513dncsr.htm#toc100513 _14.

[25] Hartford MidCap HLS Fund, Summary Prospectus, May 1, 2016, https://www.sec.gov/Archives/edgar/data/1053425/000157104916014511/t1600876_midcaphls.htm.

generating investment returns that exceeded its style-specific benchmark or a passively managed equivalent, the Centerra Defendants and Aon Hewitt failed to make a reasoned decision that adding the actively managed Fund to the Plan was in the best interest of Plan participants or prudent, and failed to determine whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. The decision to include the Aon Hewitt Fund in the Plan only served to benefit Aon Hewitt.

80.    During the time period that the Aon Hewitt Small & Mid Cap Equity Fund was included in the Plan, it underperformed its style-specific benchmark, comparable Plan investments, and passively managed equivalents. By including the Aon Hewitt Small & Mid Cap Equity Fund in the Plan, the Centerra Defendants and Aon Hewitt caused Plan participants to lose substantial retirement assets. A prudent alternative to the Aon Hewitt Small & Mid Cap Equity Fund was the Vanguard Mid-Cap Growth Index Fund (VMGMX). Had the Centerra Defendants and Aon Hewitt selected the Vanguard alternative instead of the Aon Hewitt Small & Mid Cap Equity Fund, Plan participants would not have lost in excess of $2.7 million of their retirement savings.

81.    Another prudent alternative to the Aon Hewitt Small & Mid Cap Equity Fund was the T. Rowe Price New Horizons Fund (PRNHX). Had the Centerra Defendants and Aon Hewitt retained the T. Rowe Price alternative instead of the Aon Hewitt Small & Mid Cap Equity Fund as the Plan's actively managed option, Plan participants would not have lost  in excess of $9.1 million of their retirement savings. Plan participants also would not have lost substantial retirement assets had Defendants used the Hartford MidCap HLS Fund (HIMCX) instead of the Aon Hewitt Small & Mid Cap Equity Fund, which was a suitable replacement for the Aon

Hewitt Small & Mid Cap Equity Fund.[26]

C.    **The Aon Hewitt Non-U.S. Equity Fund (Class I)**

82.    Effective June 30, 2016, the Centerra Defendants and Aon Hewitt added the Aon Hewitt Non-U.S. Equity Fund (Class I) to the Plan. The Aon Hewitt Non-U.S. Equity Fund was replaced as a Plan investment effective January 1, 2019 in connection with the Plan's merger with the Constellis Plan.

83.    Using an active investment management strategy, the Fund seeks to achieve long-term growth of capital by investing in a diversified portfolio of primarily non-U.S. equity securities. Morningstar classifies the Fund in the foreign large cap growth asset category and uses the Morgan Stanley Capital International All Country World Index Excluding U.S. Growth Index (MSCI ACWI Ex-US Growth Index) as its style-specific benchmark. The MSCI benchmark index captures large and mid-cap securities exhibiting growth style characteristics across 22 developed markets countries (excluding the United States) and 26 emerging markets countries.

84.    The Aon Hewitt Non-U.S. Equity Fund did not have a sufficient performance record when it was added to the Plan. Aon Hewitt first offered the Fund on October 1, 2013.[27] The Fund therefore had less than three years of history when the Centerra Defendants and Aon Hewitt decided to add it to the Plan. As of June 30, 2016, the Fund underperformed the benchmark identified by Aon Hewitt (MSCI ACWI Ex-US Index) for the quarter, year-to-date and one year.[28] As measured by the difference in investment returns, the Aon Hewitt Non-U.S. Equity Fund underperformed its style-specific benchmark (MSCI ACWI Ex-US Growth Index)

---

[26] Plan losses have been brought forward through September 30, 2020 to account for lost investment opportunity.
[27] Offering Stmt. at 61.
[28] *Id.*

by 178 bps in 2014 and 160 bps in 2015.

85.    The Aon Hewitt Non-U.S. Equity Fund was inferior to other comparable funds in the market. The Vanguard Total World Stock Index Fund (Instl) (VTWIX) is a passively managed foreign index fund that provides shareholders broad exposure to stock markets around the world, including developed and emerging markets. The Vanguard index fund also charged substantially lower expenses. In 2016, Aon Hewitt charged 43 bps compared to 10 bps charged by Vanguard, which is 330% more.[29] The Vanguard index fund therefore is a reasonable lower-cost alternative to the Aon Hewitt Non-U.S. Equity Fund. For the two full calendar years that the Aon Hewitt Fund had an actual performance history, the Fund substantially underperformed the Vanguard index alternative.

86.    The Vanguard International Growth Fund (Adm) (VWILX) is an actively managed comparable foreign large growth fund that provides exposure to non-U.S. companies with high growth potential. Similarly situated fiduciaries of large defined contribution plans provided the Vanguard fund to participants in their plans in 2016 and years prior.[30] The Vanguard active fund charged lower fees than the Aon Hewitt Non-U.S. Equity Fund and had an extensive performance history dating back to 1981, more than 31 years before Aon Hewitt entered the investment management business.[31] As of December 31, 2015, the Vanguard active fund outperformed its benchmark (MSCI ACWI ex US Index) over one-, five-, and ten-year

---

[29] Offering Stmt. at 58; Morningstar.

[30] These plans include but are not limited to: Kaiser Permanente 401(k) Retirement Plan, Federal Express Corporation Pilots' Retirement Savings Plan, FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan, AMEC Foster Wheeler 401(k) Plan, American Greetings Retirement Profit Sharing and Savings Plan, ON Semiconductor 401(k) Plan, Bard Employees' Savings Trust 401(k) Plan, and CNA 401(k) Plus Plan.

[31] Vanguard International Growth Fund, Form N-CSR, Aug. 31, 2016, https://www.sec.gov/Archives/edgar/data/52848/000093247116014605/finalmerge.htm.

periods.[32] And for the two full calendar years that the Aon Hewitt Fund had an actual performance history (2014 and 2015), the Vanguard fund outperformed the Aon Hewitt Fund.

87.    Because the Aon Hewitt Non-U.S. Equity Fund had an insufficient performance history and Aon Hewitt was unable to successfully manage the strategy by generating investment returns that exceeded its style-specific benchmark or a passively managed equivalent, the Centerra Defendants and Aon Hewitt failed to make a reasoned decision that adding the actively managed Fund to the Plan was in the best interest of Plan participants or prudent, and failed to determine whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. The decision to include the Aon Hewitt Fund in the Plan only served to benefit Aon Hewitt.

88.    During the time period that the Aon Hewitt Non-U.S. Equity Fund was included in the Plan, it underperformed its style-specific benchmark, comparable Plan investments, and passively managed equivalents. By including the Aon Hewitt Non-U.S. Equity Fund in the Plan, Defendants caused Plan participants to suffer performance losses. A prudent alternative to the Aon Hewitt Non-U.S. Equity Fund was the Vanguard Total World Stock Index Fund (VTWIX). Had the Centerra Defendants and Aon Hewitt selected the Vanguard alternative instead of the Aon Hewitt Non-U.S. Equity Fund, Plan participants would not have lost substantial retirement assets. Another prudent alternative to the Aon Hewitt Non-U.S. Equity Fund was the Vanguard International Growth Fund (VWILX). Had Defendants selected the Vanguard actively managed alternative instead of the Aon Hewitt Non-U.S. Equity Fund as the Plan's actively managed option, Plan participants would not have lost over $4.9 million of their retirement savings.[33]

---

[32] Vanguard International Growth Fund, Summary Prospectus, Dec. 22, 2016, https://www.sec.gov/Archives/edgar/data/52848/000093247116014939/sp81_122016.htm.

[33] Plan losses have been brought forward through September 30, 2020 to account for lost investment opportunity.

**D.    The Aon Hewitt Core Plus Bond Fund (Class I)**

89.    Effective June 30, 2016, the Centerra Defendants and Aon Hewitt added the proprietary Aon Hewitt Core Plus Bond Fund (Class I) to the Plan replacing the PIMCO Total Return Fund (Instl) (PTTRX). Over $22 million was mapped from the PIMCO fund to the Aon Hewitt Core Plus Bond Fund.

90.    The Aon Hewitt Core Plus Bond Fund was investment option in the Plan until January 1, 2019 when the Plan was merged into the Constellis Plan. Using an active investment management strategy, the Fund seeks to achieve a total return from current income and capital appreciation by investing in a diversified portfolio of fixed income securities. Morningstar classified the Fund in the intermediate-term bond asset category and identifies the Barclays U.S. Aggregate Bond Index as its benchmark. The Barclays U.S. Aggregate Bond Index measures the performance of investment grade, U.S. dollar-denominated, fixed-rate taxable bonds, including Treasuries, government-related and corporate securities, and mortgage-backed securities.

91.    The Aon Hewitt Core Plus Bond Fund did not have a sufficient performance record when it was added to the Plan. Aon Hewitt first offered the Fund on October 1, 2013.[34] The Fund therefore had less than three years of history when the Centerra Defendants and Aon Hewitt decided to add it to the Plan. As of June 30, 2016, the Fund underperformed its custom benchmark developed by Aon Hewitt over all reporting periods.[35] As measured by the difference in investment returns, the Fund also underperformed the Barclays U.S. Aggregate Bond Index by 87 bps in 2014 and 105 bps in 2015. In addition, over that two-year period, the Fund underperformed the Plan's existing PIMCO Total Return Fund (PTTRX), which was a comparable intermediate-term bond fund benchmarked to that same index.

---

[34] Offering Stmt. at 61.
[35] *Id.*

92.    The Aon Hewitt Core Plus Bond Fund was also inferior to other comparable funds in the market. The Vanguard Intermediate-Term Bond Index Fund (Instl Plus) (VBIUX) is a passively managed intermediate-term bond fund. Morningstar classified the Vanguard index fund in the intermediate-term bond asset category and uses the Barclays U.S. Aggregate Bond Index as its benchmark. The Vanguard index fund also charged substantially lower fees. In 2016, Aon Hewitt charged 26 bps compared to 4 bps charged by Vanguard, which is 550% more.[36] For the two full calendar years that the Aon Hewitt Core Plus Bond Fund had an actual performance history, the Aon Hewitt Fund substantially underperformed the Vanguard index alternative by 186 bps in 2014 and 177 bps in 2015, as measured by the difference in investment returns.

93.    The Western Asset Core Bond (IS) (WACSX) is yet another example of an investment alternative that demonstrates the inferiority of the Aon Hewitt Core Plus Bond Fund. This actively managed fund is an intermediate-term bond fund offered since 1990, and is benchmarked to the Barclays U.S. Aggregate Bond Index.[37] As of December 31, 2015, the Western Asset fund outperformed its benchmark over one-, five- and ten-year periods.[38] For the two calendar years the Aon Hewitt Core Plus Bond Fund existed, the Western Asset alternative dramatically outperformed the Aon Hewitt Fund by 244 bps in 2014 and 172 bps in 2015, as measured by the difference in investment returns. From 2011 through 2015, the Western Asset fund ranked on average in the 25th percentile, and in the top decile in two of the last three years of that period. The Western Asset fund is comparable to the Aon Hewitt fund as evidenced by the Plan's fiduciaries' decision to map the assets of the Aon Hewitt Fund into the Western Asset

---

[36] Offering Stmt. at 58; Morningstar.
[37] Western Asset Funds, Inc., Form N-CSR, Dec. 31, 2015, https://www.sec.gov/Archives/edgar/data/863520/000119312516475181/d112596dncsr.htm.
[38] Western Asset Core Bond Fund, Summary Prospectus, May 1, 2016, https://www.sec.gov/Archives/edgar/data/863520/000119312516570170/d110373d497k.htm. Class I shares used for ten-year performance.

fund when the Plan was merged into the Constellis Plan. It also was offered in the Constellis Plan since at least 2016.

94.     Because the Aon Hewitt Core Plus Bond Fund had an insufficient performance history and Aon Hewitt was unable to successfully manage the strategy by generating investment returns that exceeded its benchmark or a passively managed equivalent, the Centerra Defendants and Aon Hewitt failed to make a reasoned decision that adding the actively managed Fund to the Plan was in the best interest of Plan participants or prudent, or whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. The decision to include the Aon Hewitt Fund in the Plan only served to benefit Aon Hewitt.

95.     During the time period that the Aon Hewitt Core Plus Bond Fund was included in the Plan, it underperformed its benchmark, comparable Plan investments, and passively managed equivalents. By including the Aon Hewitt Core Plus Bond in the Plan, the Centerra Defendants and Aon Hewitt caused Plan participants to suffer performance losses. A prudent alternative to the Aon Hewitt Core Plus Bond Fund was the Vanguard Intermediate-Term Bond Index Fund (VBIUX). Had the Defendants selected the Vanguard alternative instead of the Aon Hewitt Core Plus Bond Fund, Plan participants would not have lost substantial retirement assets. The PIMCO Total Return Fund (PTTRX) and the Western Asset Core Bond Fund (WACSX) also were prudent alternatives to the Aon Hewitt Core Plus Bond Fund. Had Defendants retained the PIMCO alternative or used the Western Asset alternative instead of the Aon Hewitt Core Plus Bond Fund as the Plan's actively managed intermediate-term bond option, Plan participants would not have lost even more of their retirement assets.[39]

---

[39] Plan losses have been brought forward through September 30, 2020 to account for lost investment opportunity.

E.      **The Aon Hewitt Retirement Solution target date funds (Class I)**

96.      Target date funds are designed to provide a single diversified investment vehicle for participants. In general, they can be attractive to participants who do not want to actively manage their retirement savings to maintain a diversified portfolio. Target date funds rebalance their portfolios to become more conservative as the participant gets closer to retirement. The "target date" refers to the participant's target retirement date. For instance, target date "2030" funds are designed for individuals who intend to retire in 2030.

97.      From at least 2009 through 2015, T. Rowe Price provided the Plan's target date funds called the T. Rowe Price Retirement Funds. During 2016, the Centerra Defendants and Aon Hewitt replaced the T. Rowe Price target date funds with Aon Hewitt's proprietary Aon Hewitt Retirement Solution Funds. Aon Hewitt's target date funds were the Plan's target date funds until they were removed effective January 1, 2019 in connection with the Plan's merger with the Constellis Plan.

98.      In replacing the T. Rowe Price target date funds with the Aon Hewitt target date funds, the Centerra Defendants and Aon Hewitt failed to "balance the relevant factors and make a reasoned decision as to the preferred course of action". *George,* 641 F.3d at 788. There was no loyal or prudent reason to replace the T. Rowe Price target date funds, which were maintained by an established investment manager with a long tenure, historically performed better than peers, and were highly rated by industry professionals. Over the long-term, T. Rowe Price was one of the top performers in the target date fund market.

99.      Founded in 1937, T. Rowe Price is a financial services company that has provided investment management services for over 80 years.[40] As of December 31, 2015, T. Rowe Price

---

[40] T. Rowe Price Group, Inc., Form 10-K, Dec. 31, 2015, https://www.sec.gov/Archives/edgar/data/1113169/000111316916000033/a201510k.htm.

had $763.1 billion in assets under management, including $487.1 billion in T. Rowe Price mutual funds, and by December 31, 2019, assets under management grew to $1,206.8 billion, including $682.7 billion in T. Rowe Price mutual funds.[41] T. Rowe Price has offered target date mutual funds since 2002.[42]

100.    From 2010 through 2015, the Plan's T. Rowe Price target date funds provided exceptional investment returns to Plan participants. Over the trailing five-year period as of December 31, 2015, the T. Rowe Price target date funds outperformed other target date funds managed by established investment managers, including Vanguard, J.P. Morgan, Fidelity, and American Century.[43]

101.    T. Rowe Price's percentile rankings reflect that superior performance. From 2010 through 2015, the T. Rowe Price target date funds (2010–2055) performed at the top of its peer group. In four of those six years, the funds ranked in the top decile, and averaged a peer ranking in the 16th percentile over the entire period.

102.    This consistent and strong performance would not cause a prudent fiduciary to replace these options absent a compelling reason to do so after weighing all relevant factors. After weighing the relative merit of the T. Rowe Price target date funds and the Aon Hewitt

---

[41] *Id.*; T. Rowe Price Group, Inc., Form 10-K, Dec. 31, 2019, https://www.sec.gov/ix?doc=/Archives/edgar/data/1113169/000111316920000008/a201910k.htm.

[42] T. Rowe Price Retirement Funds, Inc., Form N-1A, Oct. 1, 2016, https://www.sec.gov/Archives/edgar/data/1177017/000117701716000659/rdf485b.htm.

[43] T. Rowe Price Retirement Funds, Inc., Form N-1A, Oct. 1, 2016, https://www.sec.gov/Archives/edgar/data/1177017/000117701716000659/rdf485b.htm; Vanguard Chester Funds, Form N-1A, Jan. 27, 2017, https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm; J.P. Morgan Trust I, Form N-CSR, Dec. 31, 2015, https://www.sec.gov/Archives/edgar/data/1217286/000119312516493430/d122175dncsrs.htm; Fidelity Aberdeen Street Trust, Form N-1A, May 28, 2016, https://www.sec.gov/Archives/edgar/data/880195/000137949116004218/filing717.htm; American Century Asset Allocation Portfolios, Inc., Form N-1A, Dec. 1, 2016, https://www.sec.gov/Archives/edgar/data/1293210/000129321016000305/acaap2016annualupdate485bp.htm.

Retirement Solutions Funds as discussed in further detail *infra*, a prudent and loyal fiduciary would not have replaced the T. Rowe Price funds.

103.    When the Aon Hewitt Retirement Solution Funds were added to the Plan effective June 30, 2016, Aon Hewitt had only limited experience managing a target date collective investment trust. Aon Trust Company and Aon Hewitt did not even begin to offer target date funds until October 2013.[44] These funds therefore had less than three years of performance history at the time the Centerra Defendants and Aon Hewitt decided to place the Aon Hewitt Retirement Solution Funds in the Plan.

104.    A prudent and loyal fiduciary would not have selected the Aon Hewitt Retirement Solution Funds without a five-year performance history to assess the investment manager's ability to provide superior long-term investment returns. The limited performance history of Aon Hewitt's target date funds was exceptionally poor. As of June 30, 2016, with the exception of one period for one fund, *all* of the actively managed Aon Hewitt Retirement Solution Funds underperformed their custom benchmark selected by Aon Hewitt over all reporting periods (quarter, year-to-date, 1 year, 2 year, and since inception).[45]

105.    Since their inception, they also substantially underperformed the Plan's existing T. Rowe Price target date funds they replaced. For the two calendar years the Aon Hewitt Retirement Solution Funds existed (2014 and 2015), they underperformed the T. Rowe Price alternative by 260 bps on average. Given Aon Hewitt's inability to provide superior long-term investment results in a target date fund strategy, a prudent and loyal fiduciary would not have replaced established and well-performing target date funds managed by T. Rowe Price with Aon Hewitt's Retirement Solution Funds.

---

[44] Offering Stmt. at 62.
[45] *Id.*

106.    The Aon Hewitt Retirement Solutions Funds were also inferior to other target date funds in the market, such as the Vanguard Target Retirement target date mutual funds. For the two calendar years the Aon Hewitt Retirement Solution Funds existed (2014 and 2015), they underperformed the Vanguard alternative by approximately 276 bps on average. Similar to T. Rowe Price, Vanguard has extensive experience in the investment management industry. Founded on May 1, 1975, Vanguard has offered investment products to investors for over 45 years.[46] Vanguard has offered target date funds since 2003.[47] Each year from 2012–2017, Vanguard received the highest Morningstar Analyst Rating for Target-Date Series mutual funds.[48] Vanguard also has been the top target date fund provider (by assets under management) since 2014.[49] Since before 2017, Vanguard's target date mutual funds have been strong performing target date funds.[50]

107.    The Constellis Plan fiduciaries recognized the prudence of using Vanguard as a target date fund manager. Since at least 2016, the Constellis Plan has invested in the Vanguard Target Retirement Funds. When the Plan merged into the Constellis Plan, the Aon Hewitt Retirement Solution Funds were replaced by this Vanguard alternative.

108.    The significance of a plan's target date fund option underscores the importance of a prudent and loyal selection process and continuous oversight of that option. Participants may

---

[46] Vanguard Chester Funds, Form N-1A, Jan. 27, 2017, https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm.

[47] Vanguard Chester Funds, Form N-CSR, Mar. 31, 2006, https://www.sec.gov/Archives/edgar/data/752177/000093247106000887/chesterfundsfinal.htm.

[48] John Croke, *Vanguard Earns Morningstar Gold,* June 21, 2019, https://institutional.vanguard.com/VGApp/iip/site/institutional/researchcommentary/article/InvComVanguardMorningstarGold. Morningstar, Inc. is a leading provider of investment research and investment services, and is relied on by industry professionals.

[49] Morningstar, 2019 Target Date Fund Landscape, at 9, 11 https://institutional.vanguard.com/iam/pdf/TDFLNDSCP.pdf.

[50] *E.g.,* Morningstar, 2019 Target Date Fund Landscape at 33; Vanguard Chester Funds, Form N-1A, Jan. 27, 2017, https://www.sec.gov/Archives/edgar/data/752177/000093247117000194/chester485b.htm.

solely rely on their single target date fund selection over their investment horizon to meet their retirement goals. No prudent fiduciary would subject Plan participants to an unproven fund that they heavily rely on to invest for retirement.

109.    When the Aon Hewitt Retirement Solution Funds were included in the Plan, they significantly underperformed the T. Rowe Price target date funds that were removed from the Plan, as well as Vanguard's target date funds. A prudent alternative to the Aon Hewitt Retirement Solution Funds was the T. Rowe Price Retirement Funds. By being forced to invest in the Aon Hewitt Retirement Solution Funds instead of the T. Rowe Price Retirement target date funds, Plan participants lost in excess of $2 million of their retirement savings. Another prudent alternative to the Aon Hewitt Retirement Solution Funds was the Vanguard Target Retirement Funds. Had the Centerra Defendants and Aon Hewitt provided the Vanguard Target Retirement target date funds instead of the Aon Hewitt Retirement Solution Funds, Plan participants also would not have lost substantial retirement assets.[51]

III.    **The Centerra Defendants caused unreasonable recordkeeping fees to be charged to Plan participants.**

A.    **The actions of prudent fiduciaries in monitoring recordkeeping expenses and making sure they are reasonable in light of all services provided.**

110.    Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely

---

[51] Plan losses have been brought forward through September 30, 2020 to account for lost investment opportunity.

commodities, and the market for recordkeeping services is highly competitive.

111.    Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services. In light of the commoditized nature of the essential recordkeeping services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans.

112.    The cost of recordkeeping services depends on the number of participants (or participant accounts), not on the amount of assets in the participant's account.[52] Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Consequently, prudent fiduciaries negotiate a fixed dollar amount for the recordkeeper's annual compensation, usually based on a rate of a fixed dollar amount per participant. Because of economies of scale, large plans get lower effective rates per participant than smaller plans. Plans with 5,000 participants or more can obtain much lower rates per participant than a plan with 500 participants.

113.    A study commissioned by the U.S. Department of Labor in 1998 demonstrates these economies of scale, finding that as the number of plan participants increases, the cost per

---

[52] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management— Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/ attachments/global/Retirement/DC%20Fee%20Management%20%20Mitigating%20Fiduciary%20Risk %20and%20Maximizing%20Plan %20Performance.pdf ("Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.") ("Mercer Best Practices").

participant decreases.[53] Per the Study, the below expenses were based on quotations "of major 401(k) service providers."[54]

| Number of Participants | Service Provider Cost Per Participant |
|---|---|
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

114. Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of plan assets.[55] Otherwise, as plan assets increase, such as through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.[56]

115. For example, if a plan has 5,000 participants, a fiduciary could negotiate a plan-level contract to pay the recordkeeper $250,000 per year, based on a rate of $50 per participant fee per year. The negotiated $250,000 recordkeeping fee then can be assessed to participant accounts pro rata so that smaller accounts pay a smaller portion of the fee. If the plan's assets increase during the contract while the number of participants stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

116. A fixed-dollar compensation arrangement does not necessarily mean, however, that every participant in the plan must pay the same $50 fee from his or her account. The

---

[53] U.S. Dept. of Labor, *Study of 401(k) Plan Fees and Expenses* (1998), https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.

[54] *Id.* at § 4.2.2 ("Recordkeeping and Administration Expenses").

[55] Mercer Best Practices at 3 ("1. Price administrative fees on a per-participant basis.").

[56] *Id.* ("Negotiate a fixed-rate recordkeeping fee, based on the number of participants with account balances in the plan, that is independent of the investment structure (referred to as an 'open investment architecture' model). This approach, unlike an 'asset-based' or 'bundled' model, provides fee transparency and affords fiduciaries a sound basis for documenting the 'reasonableness' of recordkeeping fees. Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.").

fiduciary could reasonably determine that it is equitable to charge each participant the same $50

(for example, through a quarterly charge of $12.50 to each account in the plan). Alternatively,

the fiduciary could conclude that assessing the same fee to all investors would discourage

participants with relatively small accounts from participating in the plan; and that, once the

aggregate flat fee for the plan has been determined, a proportional asset-based charge would be

best.

117.    In that case, the rate of $50 per-participant multiplied by the number of

participants would be converted to an asset-based charge, such that every participant pays the

same percentage of his or her account balance while the plan pays only a fixed amount unrelated

to asset size. If the plan in the example had $300 million in assets, each participant would pay a

direct recordkeeping fee of .08% of her account balance annual for recordkeeping

($250,000/$300,000,000 = .00083). As the plan's assets increase thereafter, the *plan* is still

paying the same $250,000 price that was negotiated at the plan level, but the fees paid by

individual participants changes as they are proportionally allocated among participants based on

account balance.

118.    Mutual funds are commonly provided as investment options in retirement plans.

Mutual funds sometimes agree to pay recordkeepers a percentage of fund assets to compensate

for the cost of recordkeeping a plan, an arrangement called "revenue sharing." This asset-based

fee is negotiated between the mutual fund and the recordkeeper and usually is concealed.

Although paying for recordkeeping with an asset-based fee is not a *per se* violation of ERISA, it

can lead to excessive fees if not monitored and capped by the plan fiduciary. If a fiduciary allows

the plan recordkeeper to be compensated with an asset-based fee, the payments can become

excessive based on an increase in plan assets alone. For example, the S&P 500 increased over

20% in 2017, leading to large increases in asset-based fees for services which have not changed. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

119.    To make an informed assessment as to whether a recordkeeper is receiving no more than reasonable compensation for the services provided to a plan, prudent fiduciaries of defined contribution plans monitor *all* sources of compensation received by plan recordkeepers—including, without limitation, any revenue sharing or payments from managed account providers—and determine whether the compensation is reasonable for the services provided.

120.    If a fiduciary decides to use an asset-based fee to pay for recordkeeping, prudent fiduciaries recognize that it is critical to (1) negotiate a fixed amount of recordkeeping compensation based on a reasonable rate per participant per year; (2) determine all revenue sharing and other sources of compensation the recordkeeper receives from plan investment options; and then (3) recover all revenue sharing payments that exceed the negotiated compensation.

121.    Experts in the field agree that the most certain way to determine the least compensation a plan must pay for a desired level of recordkeeping services is to put the plan's recordkeeping services out for competitive bidding on a regular basis. Prudent fiduciaries do this

every three years.[57] For example, Fiduciary360's Prudent Practices for Investment Stewards, [58] which is widely accepted as the global fiduciary standard of excellence, advised fiduciaries that they must determine "whether the fees are reasonable in light of the services provided" and "[c]onsideration is given to putting vendor contracts back out to bid every three years."[59]

122.    Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These Requests for Proposal ("RFPs") were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[60] The Department of Labor noted that fiduciaries conduct an RFP to assess the reasonableness of the service provider's fees every three to five years.[61]

**B.    Contrary to the practices of prudent fiduciaries, the Centerra Defendants failed to obtain a reasonable recordkeeping fee for the Plan.**

123.    Voya Institutional Plan Services, LLC (Voya) (fka ING Institutional Plan

---

[57] *See* Donald Stone, *Conducting a Successful Fee Review: How to determine whether plan fees are reasonable,* DEFINED CONTRIBUTION INSIGHTS, Jan./Feb. 2006, at 4 (stating "most reliable way of determining whether fees the plan is paying are reasonable" is through an RFP or an RFI search process); Tyler Polk, *Is it Time for a Change? Best Practice in Retirement Plan Record Keeper Searches,* FIDUCIARY INVESTMENT ADVISORS (April 2015); John Carl, *Including Regular RFPs as Part of a Fiduciary Liability Reduction Strategy,* Jan. 24, 2018 ("The DOL assumes that plan sponsors solicit RFPs for service providers every three to five years as part of their fiduciary duty to monitor plan service providers."), https://www.napa-net.org/news/technical-competence/case-of-the-week/including-regular-rfps-part-fiduciary-liability-reduction-strategy/; Roger Levy, *Selecting Service Providers, Competitive Bidding, & RFP's Importance in a Fiduciary Investment Process,* INHUB, May 18, 2015, https://d1yoaun8syyxxtcloudfront.net/br189-76a8e37a-950c-41a0-b246-47bb6162f4a4-v2.

[58] *Prudent Practices for Investment Stewards* handbook defines the Global Fiduciary Standard of Excellence, initially published in April 2003, that was derived from a prior publication (*Prudent Investment Practices*) co-produced by the Foundation for Fiduciary Studies and the American Institute of Certified Public Accountants. This publication was written by Fiduciary 360, the identity brand for three related entities: the Foundation for Fiduciary Studies, the Center for Fiduciary Studies, and Fiduciary Analytics. The Foundation for Fiduciary Studies defines and substantiates specific investment fiduciary practices for trustees and investment committee members, investment advisors and investment managers and is widely used in the industry.

[59] Fiduciary360, *Prudent Practices for Investment Stewards*, Practices S-1.4, S-4.4 (2007).

[60] Rebecca Moore, *Most Recordkeeping RFPs to Benchmark Fees*, PLANSPONSOR, Jan. 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/.

[61] U.S. Dept. of Labor, *Meeting Your Fiduciary Responsibilities*, at 5–6 (2012).

Services, LLC) provided recordkeeping services to the Plan from at least 2009 through 2018. Effective January 1, 2019, Constellis contracted with Voya to provide recordkeeping services for the Constellis Plan. Rather than negotiating a fixed fee for recordkeeping services, the Centerra Defendants chose to pay Voya for recordkeeping services through a combination of direct charges to participant accounts and asset-based fees paid from the Plan's investments from 2014–2015, and solely asset-based payments from 2016–2018.

124.    While revenue sharing payments are ostensibly provided as compensation to the recordkeeper for providing recordkeeping services a mutual fund otherwise would have provide, the payments can effectively be kickbacks for including the fund in a plan's investment lineup because the amount of revenue sharing paid due to a plan's large investment in mutual funds can exceed reasonable compensation for the services provided. This excess over a reasonable fee is particularly likely since revenue sharing is asset based and thus prone to increase as plan assets increase through contributions and investment growth, even though recordkeeping services do not.

125.    In a plan that allows revenue sharing payments to its recordkeeper from plan investments, a prudent and loyal fiduciary monitors that revenue sharing to ensure that the recordkeeping does not receive total compensation from the plan exceeding a reasonable, per participant fee for the desired level of recordkeeping services. If it does not, a prudent and loyal fiduciary compels the recordkeeper to refund to the plan all revenue sharing it receives that exceed a reasonable, fixed recordkeeping fee. Such monitoring applies to all other sources of compensation that the recordkeeper may receive.

126.    As set forth *infra,* in light of all direct and indirect sources of revenue, the Centerra Defendants failed to negotiate a reasonable amount with Voya for recordkeeping

services and adequately monitor all sources of Voya's compensation, causing the Plan to pay excessive recordkeeping fees. From the beginning of 2014 to year-end 2017, the Plan's assets substantially increased by 36% from $273 million to over $372 million. Over that time period, the recordkeeping fees paid by the Plan increased from $95 per participant (approx. $400,000) to $139 per participants (approx. $595,000), a 46% increase in recordkeeping fees.[62] Because the Centerra Defendants chose to pay asset-based recordkeeping fees (exclusively asset-based payments after 2015), Voya's compensation skyrocketed even though the services it provided to the Plan remained the same. This contributed to the already excessive compensation received by Voya.

127.    These payments do not reflect the total compensation Voya received from providing Plan recordkeeping services. Voya provided managed account services to participants in the Plan (and now the Constellis Plan). Managed accounts are investment services under which providers make investment decisions for participants to allocate their retirement savings among a mix of available investment options made available under the plan. For managed account services, Voya charges an asset-based fee based on the participant's account balance in a managed account. From 2014 through 2018, the amount Voya received putatively for providing managed account services dramatically increased from $209,000 to $550,000, an 163% increase in compensation.

128.    The foregoing facts demonstrate that the Centerra Defendants failed to properly monitor Voya's total compensation from all sources in light of the services Voya provided, which caused the Plan to pay unreasonable recordkeeping fees. When a recordkeeper is compensated for also providing managed account services to defined contribution plan

---

[62] Even though the Plan's assets declined to $350 million in 2018, Voya's recordkeeping compensation was still 15% higher than in 2014 (or $109 per participant).

participants, a prudent fiduciary monitors this source of revenue and leverages it to obtain lower recordkeeping fees, or a reduction in the managed account fees. However, the Centerra Defendants failed to do so.

129.    Based on the Plan's features, the nature of recordkeeping services provided by Voya, the total number of participants with account balances (4,146–5,036), and the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plan from 2014 through 2018 would have been no more than $206,000–$252,000 (or at most $50 per participant with an account balance).

130.    This is consistent with recordkeeping fees charged to similarly sized defined contribution plans by prominent recordkeepers after requests for proposal during the period. The following table identifies recordkeeping fees paid per participant with account balance by such plans according to Form 5500 data.

| Year | Plan Name | Assets | Ppts | Ppt Fee | Recordkeeper |
|------|-----------|--------|------|---------|--------------|
| 2013 | Wrigley Savings Plan | $446 million | 3,146 | $26.69 | Mercer HR Services, LLC |
| 2014 | Wrigley Savings Plan | $449 million | 3,132 | $29.21 | Mercer HR Services, LLC |
| 2013 | HealthFirst Profit Sharing 401(k) Plan | $103 million | 3,104 | $37.42 | Verisight, Inc. |
| 2014 | HealthFirst Profit Sharing 401(k) Plan | $123 million | 3,732 | $32.74 | Verisight, Inc. |
| 2013 | Calanese Americas Retirement Savings Plan | $583 million | 3,785 | $46.34 | J.P. Morgan Retirement Plan Services |
| 2014 | Calanese Americas Retirement Savings Plan | $588 million | 3,881 | $48.63 | Great-West Financial RPS, LLC |
| 2013 | Expeditors International of Washington, Inc. 401(k) Plan | $304 million | 5,744 | $50.33 | Milliman |
| 2014 | Expeditors International of Washington, Inc. 401(k) Plan | $343 million | 6,334 | $38.44 | Milliman |

131.    Based on the direct payments paid by Plan participants and the annual revenue

share (or asset-based recordkeeping fees) paid by Plan investments, the Plan paid up to $139 per participant (or $484,000 on average) from 2014 through 2018. This resulted in substantial unreasonable recordkeeping fees each year, all of which was paid from Plan assets, meaning from participants' retirement accounts.

132.    In light of the foregoing facts, it is evident that the Centerra Defendants failed to conduct a competitive bidding process for the Plan's recordkeeping services since the Centerra Defendants hired Voya as the Plan's recordkeeper in 2009, if not before. Their actions were contrary to industry practices and the recommendations of the Department of Labor. A competitive bidding process for the Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the Plan. That is particularly so because recordkeeping fees for large defined contribution plans have been declining since 2014. By failing to engage in a competitive bidding process for Plan recordkeeping services, the Centerra Defendants caused the Plan to pay unreasonable recordkeeping fees for the services rendered.

133.    The foregoing facts also demonstrate that the Centerra Defendants failed to retain an independent third party to appropriately benchmark the reasonableness of the direct and indirect compensation received by Voya to ensure that only reasonable fees were charged to Plan participants for recordkeeping services and advice.

134.    By failing to prudently monitor and assess the Plan's recordkeeping fees, and obtain competitive bids for Plan recordkeeping services, the Centerra Defendants caused Plan participants to lose substantial retirement savings through unreasonable recordkeeping fees.[63]

## CLASS ACTION ALLEGATIONS

135.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to

---

[63] Plan losses have been carried forward using the investment return of an S&P 500 index fund, the Vanguard Institutional Index (VIIIX), to account for lost investment returns on those assets.

bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

136.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all Plan participants and beneficiaries. Plaintiffs seek to certify the follow class:

> All participants and beneficiaries of the Centerra Group, LLC 401(k) Plan from December 4, 2014 until January 1, 2019, excluding Defendants and members of the Benefit Plan Committee of Centerra Group, LLC, and the Investment Committee of Centerra Group, LLC.

137.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.     The Class includes over 5,000 members and is so large that joinder of all its members is impracticable.

b.     There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and made omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches of duty.

c.     Plaintiffs' claims are typical of the claims of the Class because each

Plaintiff was a participant during the time period at issue in this action and all participants

in the Plan were harmed by Defendants' misconduct.

      d.     Plaintiffs are adequate representatives of the Class because they were

participants in the Plan during the Class period, have no interest that is in conflict with

any other member of the Class, are committed to the vigorous representation of the Class,

and have engaged experienced and competent attorneys to represent the Class.

      e.     Prosecution of separate actions for these breaches of fiduciary duties by

individual participants and beneficiaries would create the risk of (A) inconsistent or

varying adjudications that would establish incompatible standards of conduct for

Defendants in respect to the discharge of their fiduciary duties to the Plan and personal

liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual

participants and beneficiaries regarding these breaches of fiduciary duties and remedies

for the Plan would, as a practical matter, be dispositive of the interests of the participants

and beneficiaries not parties to the adjudication or would substantially impair or impede

those participants' and beneficiaries' ability to protect their interests. Therefore, this

action should be certified as a class action under Rule 23(b)(1)(A) or (B).

138.    A class action is the superior method for the fair and efficient adjudication of this

controversy because joinder of all participants and beneficiaries is impracticable, the losses

suffered by individual participants and beneficiaries may be small and impracticable for

individual members to enforce their rights through individual actions, and the common questions

of law and fact predominate over individual questions. Given the nature of the allegations, no

class member has an interest in individually controlling the prosecution of this matter, and

Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter

as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

139.    Plaintiffs' counsel, Schlichter Bogard & Denton, LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g). Schlichter Bogard & Denton has been appointed as class counsel in over 30 other ERISA class actions regarding excessive fees in large defined contribution plans. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution excessive fee litigation:

- On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. Nov. 3, 2016).

- As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 WL 43984750, at *1 (S.D. Ill. July 17, 2015). The court further recognized that the law firm of "Schlichter, Bogard & Denton has had a humongous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Id.* at *3 (internal quotations omitted).

- Other courts have made similar findings:

  o "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc*., No. 08-3799, 2012 WL 13089487, at *2 (N.D. Ill. June 26, 2012).

  o "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp*., No. 07-2046, 2013 WL 12242015, at *2 (C.D. Ill. Oct. 15, 2013).

- o "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co*., No. 06-703, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

- o U.S. District Judge Harold Baker of the Central District of Illinois acknowledged the significant impact of the firm's work, finding that as of 2013, the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 WL 12242015, at *2 (emphasis added).

- o U.S. District Judge David Herndon of the Southern District of Illinois recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general. *Beesley*, 2014 WL 375432, at *2.

- o U.S. District Court Judge G. Patrick Murphy similarly recognized the work of Schlichter, Bogard & Denton as exceptional:

  > Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work[,] investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans.

  *Will v. General Dynamics Corp.*, No. 06-698, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010).

- Schlichter, Bogard & Denton handled the first full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc*., 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc*., No. 06-4305, 2012 WL 5386033, at *3 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs'

attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 WL 8485265, at *2 (W.D. Mo. Dec. 9, 2015).

- In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-743, Doc. 587, at 5–6 (S.D. Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

- In approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D. N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

- On January 28, 2020, Judge George L. Russell of the District of Maryland found Schlichter, Bogard & Denton "pioneered this ground-breaking and novel area of litigation" that has "dramatically brought down fees in defined contribution plans" after the firm obtained a $14 million dollar settlement. *Kelly v. Johns Hopkins Univ.*, No. 16-2835-GLR, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020).

- Schlichter, Bogard & Denton is also class counsel in handled *Tibble v. Edison International*, 135 S. Ct. 1823 (2015), the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Id*. at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

- The firm's work in ERISA excessive fee class actions has been featured in the New York

Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See*, *e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, Wall St. J. (May 15, 2016);[64] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. Times (Mar. 29, 2014);[65] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, Wall St. J. (Feb. 23, 2015);[66] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. Times (Oct. 16, 2014);[67] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, Wall St. J. (Aug. 25, 2015);[68] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, Wall St. J. (May 18, 2015); [69] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[70] Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, Reuters (May 1, 2014);[71] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, Bloomberg (Oct. 2, 2014).[72]

## COUNT I: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) AGAINST THE CENTERRA DEFENDANTS AND AON HEWITT RELATED TO THE AON HEWITT COLLECTIVE INVESTMENT TRUSTS

140.    Plaintiffs restate and incorporate the allegations contained in the preceding

paragraphs.

141.    This Count alleges breach of fiduciary duties against the Centerra Defendants and

Aon Hewitt.

142.    These Defendants were required to act "solely in the interest" of participants and

to manage the assets of the Plan for the "exclusive purpose of providing benefits to participants

and their beneficiaries, and defraying reasonable expenses of administering the Plan", and "with

the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent

man acting in a like capacity and familiar with such matters would use in the conduct of an

---

[64] http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[65] http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[66] http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[67] http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[68] http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[69] http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[70] http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[71] http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[72] http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

enterprise of a like character and with like aims". 29 U.S.C. §1104(a)(1)(A)–(B). Defendants were directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent designated investment alternatives, and taking all necessary steps to ensure that the Plan's assets were invested prudently. As the Supreme Court confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

143.    The Centerra Defendants and Aon Hewitt breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B) by selecting and retaining the Aon Hewitt collective investment trusts in the Plan. Instead of acting solely in the interest of Plan participants, these Defendants put their own interests first, selecting and retaining the Aon Hewitt collective investment trusts because of the benefits they provided to Aon Hewitt, which came at the expense of participants' retirement savings. While Aon Hewitt received millions of dollars in Plan assets for its investment management business and significant fee revenues, participants sustained massive losses in retirement savings due to high fees and poor performance. Moreover, Defendants failed to engage in a reasoned decision-making process to determine that using the Aon Hewitt funds was in the best interests of Plan participants or prudent, and failed to determine whether participants would be better served by other prudent and better performing alternatives available to the Plan after considering all relevant factors. Defendants' decision to add the proprietary Aon Hewitt funds to the Plan caused the Plan and its participants to incur significant performance losses.

144.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

145.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the

Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

146.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) AGAINST THE CENTERRA DEFENDANTS RELATED TO UNREASONABLE RECORDKEEPING AND ADMINISTRATIVE FEES

147.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

148.    This Count alleges breach of fiduciary duties against the Centerra Defendants.

149.    If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George*, 641 F.3d at 798–99. Separately, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying . . . through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense" is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

150.    The Centerra Defendants caused the Plan to pay unreasonable recordkeeping fees to the Plan's recordkeeper, Voya. These Defendants failed to engage in a prudent and loyal process for the ongoing retention of Voya. They failed to monitor Voya's compensation. The

Centerra Defendants also failed to put the Plan's recordkeeping services out for competitive bidding on a regular basis, at least every three years, to ensure the Plan's recordkeeper only received reasonable compensation for the services provided.

151.    The Centerra Defendants therefore breached their duties of loyalty and prudence under 29 U.S.C. §1104(a)(1)(A) and (B), as a direct result of which the Plan and participants suffered losses from the reduction of Plan assets by the amount of unreasonable recordkeeping fees and the lost investment returns on those retirement assets.

152.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

153.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

154.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

### COUNT III: PROHIBITED TRANSACTIONS (29 U.S.C. §1106) AGAINST THE CENTERRA DEFENDANTS AND AON HEWITT RELATED TO THE AON HEWITT COLLECTIVE INVESTMENT TRUSTS

155.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

156.    This Count is asserted against the Centerra Defendants and Aon Hewitt.

157.    Section 1106(b) prohibits transactions between a plan and a fiduciary. 29 U.S.C.

§1106(b). Aon Hewitt was a Plan fiduciary, and caused the Plan to use Aon Hewitt collective investment trusts and to pay Plan assets to Aon Hewitt. Aon Hewitt therefore dealt with the assets of the Plan in its own interest or for its own account, in violation of 29 U.S.C. §1106(b)(1); acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2); and received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

158.    Section 1106(a) prohibits transactions between a plan and a party in interest. 29 U.S.C. §1106(a). Aon Hewitt is a party in interest because it was a Plan fiduciary, and an entity who provided services to the Plan. 29 U.S.C. §1002(14)(A) and (B). The Centerra Defendants and Aon Hewitt caused the Plan to use Aon Hewitt collective investment trusts and to pay Plan assets to Aon Hewitt. These Defendants therefore caused the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A); engage in a transaction they knew or should have known constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C); and engage in a transaction they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

159.    As a direct result of these prohibited transactions, the Centerra Defendants and Aon Hewitt caused the Plan to suffer losses in the reduction of Plan assets in amount of the payments to Aon Hewitt and the lost investment returns on those assets.

160.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the

Plan any losses to the Plan resulting from the breaches of fiduciary duties and prohibited transactions alleged in this Count and to restore to the Plan all profits through their use of Plan assets, and is subject to other equitable or remedial relief as appropriate, including removal as a Plan fiduciary.

## COUNT IV: FAILURE TO MONITOR FIDUCIARIES AGAINST THE CENTERRA DEFENDANTS

161.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

162.    This Count is asserted against the Centerra Defendants.

163.    Centerra oversaw the overall governance of the Plan and had the authority to delegate any of its fiduciary responsibilities, including allocating such responsibilities to the Benefits and Investment Committees of Centerra, as well as to Aon Hewitt. To the extent any of the fiduciary responsibilities of the Centerra Defendants were delegated to another fiduciary, their monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

164.    A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties.

165.    The Centerra Defendants breached their fiduciary monitoring duties by, among other things:

       a.    failing to monitor their appointees and delegees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions

with respect to the Plan;

b.  failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the unreasonable recordkeeping fees or imprudent investment options in violation of ERISA;

c.  failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's investments; and

d.  failing to remove appointees and delegees whose performance was inadequate in that they continued to allow unreasonable fees to be charged to Plan participants or imprudent investment options to be selected and retained in the Plan, all to the detriment of Plan participants' retirement savings.

166.    As a direct result of these breaches of fiduciary duty to monitor, the Plan suffered substantial losses. Had the Centerra Defendants and the other delegating fiduciaries discharged their fiduciary monitoring duties prudently as described above, the Plan would not have suffered these losses.

## JURY TRIAL DEMANDED

167.    Under Federal Rule of Civil Procedure 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

•  find and declare that Defendants have breached their fiduciary duties as described above;

•  find and adjudge that Defendants are personally liable to make good to the Plan

all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- enjoin the fiduciaries who have breach their fiduciary duties from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

December 4, 2020                    Respectfully submitted,

                                   ROBINSON GRAY STEPP & LAFFITTE, LLC

                                   By: s/ Beth Burke Richardson

                                        Beth Burke Richardson
                                        Fed. I.D. No.: 9335
                                        brichardson@robinsongray.com
                                        1310 Gadsden Street
                                        Post Office Box 11449
                                        Columbia, South Carolina 29211
                                        (803) 929-1400 Telephone
                                        (803) 929-0300 Fax

                                        *Local Counsel for Plaintiffs*

                                   SCHLICHTER BOGARD & DENTON LLP
                                        Jerome J. Schlichter, Mo. 32225*
                                        Michael A. Wolff, Mo. 38207*
                                        Kurt C. Struckhoff, Mo. 61873*
                                        Nathan H. Emmons, Mo. 70046*
                                        100 South Fourth Street, Suite 1200
                                        St. Louis, MO, 63102
                                        (314) 621-6115 Telephone
                                        (314) 621-5934 Fax
                                        jschlichter@uselaws.com
                                        mwolff@uselaws.com
                                        kstruckhoff@uselaws.com
                                        nemmons@uselaws.com
                                        **pro hac vice* applications forthcoming

                                        *Class Counsel for Plaintiffs*